UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JEFFREY S. YESSENOW, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 2:08-CV-353 PPS |
| | ) | |
| HILTON M. HUDSON II, M.D., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Jeffrey Yessenow and Hilton Hudson are doctors who got into the business of investing in and running a hospital, and it turned out to be a colossal mistake. The hospital is now in bankruptcy, and the two doctors find themselves in deep financial trouble – Yessenow in particular, having personally secured the hospital's debts with the signing of a promissory note secured by a mortgage on his Chicago condominium. After he pledged his condo, Yessenow turned around and entered into an Indemnification Agreement in an effort to off-load his risk to another entity which Hudson, in turn, personally guaranteed. After the hospital went belly-up and the bank threatened to foreclose on Yessenow's condo, he sued Hudson on the guaranty. The principal issue presently before me on cross motions for summary judgment [DE 156; DE 171] is whether the Indemnification Agreement and Hudson's guaranty are supported by consideration. Because I find that they are not, Yessenow's motion will be denied, and Hudson's motion granted.

**Background**

Heartland Memorial Hospital ("the Hospital") is located at 701 Superior Avenue in Munster, Indiana and was formed in 2006 through a complex transaction. It was later sold, and

is now in bankruptcy.  *In re Heartland Memorial Hosp., LLC*, Cause No. 11-02151 (N.D. Ind. Bankr., filed 10/05/11).  The present dispute involves a tiny portion of the litigation stemming from the founding and operation of the Hospital and its subsequent bankruptcy.

The facts relating to the merger that created the Hospital are convoluted.  And although this case rises and falls on the interpretation of an Indemnification Agreement that came about after the Hospital's formative transaction closed, a description of the underlying transaction is necessary to put into context the Indemnification Agreement that followed.

Defendant Leroy Wright was a businessman and the driving force behind the transaction that led to the formation of the Hospital.  According to plaintiff Yessenow, Wright came to him with the idea of investing in the Hospital.[1]  At the time, Dr. Yessenow practiced medicine at Illiana Surgery and Medical Center, LLC ("Illiana"), which included the 701 Superior Avenue property (that eventually became the Hospital) and five satellite locations.  Dr. Yessenow was also intricately involved in Illiana's administration – he was Illiana's President and CEO, and in 2004 he invested in a company that held title to the 701 Superior Avenue property. [DE 158-4, at 6; DE 164-2, at 6.]

The second defendant in this case, Dr. Hilton Hudson, wasn't nearly as connected to Illiana as Yessenow.  Hudson was a cardiologist practicing at the University of Chicago Medical Center when Wright brought him to Illiana, and he began providing medical services there as an independent contractor. [DE 157-2, at 3.]  Although his profession is medicine, Hudson also owns defendant Hilton Publishing. [DE 157-2, at 6.]

---

[1] In September 2010, after this investment unraveled, Wright committed suicide.  Although they have been named as defendants, Yessenow isn't seeking judgment against Wright or his affiliated entities.

As I mentioned, Wright approached Yessenow and proposed a merger between Illiana and TWG Illiana Surgery and Medical Center, Inc., a company that Wright founded. According to Wright, his company, Wright Capital Partners, actually founded TWG for the sole purpose of acquiring Illiana. [DE 88 at 57.] TWG and Illiana eventually agreed to the merger, and in October 2005, TWG and Illiana entered into an Agreement and Plan of Merger, whereby TWG would purchase all of Illiana's stock for $25 million. [DE 158-2.][2] Even though Hudson was a shareholder in TWG it is clear from the record that Wright was the driving force behind TWG. It was Wright who founded the company, he is the one who signed all of the paperwork for the merger between TWG and Illiana, and it was Wright who came up with the idea for the merger in the first place. [DE 158-2 at 53; 158-3 at 23.] After the merger was completed, Wright was the Chairman of the Board and Yessenow the Chief Executive Officer of the newly formed company. [DE 157-5 at 34; 158-4 at 40, 72; 158-5 at 4.]

A few months later, in February 2006, TWG Illiana – the newly formed corporation – began negotiating with an investment fund named NL Ventures to sell the five satellite properties for $18 million and then lease them back to Illiana. [DE 158-3.] A letter of intent was signed on February 6, 2006 between NL Ventures and TWG Illiana. [*Id.* at 19.] And on February 27, 2006, the deal to sell the five properties to NL Ventures was signed. [DE 158-3.]

When it came to time to negotiate the leaseback of the five properties, NL Ventures wanted assurances that Illiana could actually pay the rent. So NL Ventures required TWG Illiana to sign a Guaranty of Lease as part of the lease. [158-4 at 65.] But to make the deal go

---

[2] The agreement is actually between TWG and IHealthcare, Inc. Illiana is an LLC whose sole member is IHealthcare, Inc. For simplicity's sake I refer to IHealthcare and Illiana in this opinion as simply "Illiana."

3

through, NL Ventures also required Illiana to provide a letter of credit listing NL Ventures as the beneficiary, to provide security to NL Ventures that the rent would be paid – at least for the first year. [DE 157-1; DE 158-6.] Illiana obtained an Irrevocable Standby Letter of Credit from National City Bank in the amount of $1,467,948, listing NL Ventures as the beneficiary. [DE 158-6.] But National City Bank wanted security too. So Yessenow agreed to secure it personally with a condo that he owned in Chicago.

On March 17, 2006 Yessenow signed three documents – a Disbursement Request and Authorization, a Promissory Note, and a Mortgage secured by the condo. [DE 18-3; 158-8; 173-3.] The technical purpose of each document isn't as important as the fact that these documents, as a group, were intended to hold Yessenow personally responsible to the bank if Illiana defaulted on its rent payments to NL Ventures. Where matters get murky (or murkier I should say) is the fact that there are actually two promissory notes signed by Yessenow. The first is the one I just referenced and is dated March 17, 2006. It is signed "Jeffrey Yessenow per trust 1/05/94." [DE 18-4 at 3.] The reference to "1/05/94" is evidently the date his trust was formed. The second promissory signed by Yessenow is identical to the first with the exception that it is signed as follows: "Jeffrey Yessenow 4/5/06." [DE 29-2 at 5.] It is entirely unclear from the record why there are two copies of the promissory note signed by Yessenow.

In any event, we know that the sale leaseback deal with NL Ventures closed after Yessenow signed the first promissory note – but before he signed the second copy of the note – because the escrow statement from the title company shows a disbursement date of March 24, 2006, two weeks before Yessenow signed the second copy of the promissory note. [DE 158-7.] And the sale leaseback transaction would only have closed if NL Ventures was secured.

4

Everything up to this point is background to provide context for the transaction upon which this case turns. Here's what happened: On March 31, 2006, after the sale/leaseback transaction with NL Ventures closed, Dr. Yessenow, Leroy Wright, and Dr. Hudson signed an Indemnification Agreement. [DE 158-5.] Under the Indemnification Agreement, the "Corporation" (i.e the entity resulting from the merger of TWG and Illiana) agreed to indemnify Yessenow from any losses associated from the pledging of his condo.

The Indemnification Agreement begins by stating that the agreement is between the "Corporation" and "the Obligor" (Yessenow). Then, it lays out several recitals. And importantly, all of the recitals are backward-looking. We know this because the recitals repeatedly use the past tense. First, the Agreement says that the Corporation "*was required* to obtain a six (6) month letter of credit which secures the security deposit for the . . . sale and lease back which is an integral part of Corporation's acquisition of Illiana Surgery and Medical Center, LLC." [*Id.*] (emphasis added). Then it states the following:

> WHEREAS, National City Bank . . . *would only agree* to issue such . . . letter of credit upon the satisfaction of certain conditions including a requirement that, and in satisfaction of which, Obligor *has executed* a Promissory Note payable [sic] the bank, known as Loan Number 102449, *secured by* a Mortgage likewise executed and *duly granted* to the Bank by Obligor.

[*Id.*] (emphasis added). As the italicized language makes clear, at the time the Indemnification Agreement was signed on March 31, Yessenow as the "Obligor" had already assumed the underlying obligation – he had already "executed a promissory note" pledging his condo on March 17.

Following the recital, the Indemnification Agreement states that the "Corporation desires to protect Obligor from any loss, costs, expenses, damage or injury to which Obligor exposes

5

himself or his property by reason of the Obligation by indemnifying and holding Obligor harmless . . . ." It concludes the recitals by stating, "for good and valuable consideration, the parties hereto, intending to be legally bound, hereby agree as follows." Then Section 1 details the terms by which the Corporation would indemnify Yessenow.

Section 2 of the Agreement sets forth the guaranty clause. Under the guaranty, Dr. Hudson and Hilton Publishing, as well as Wright and his entities, agreed to "guarantee, jointly and severally, the full and timely payment and performance of all indemnification duties and obligations of Corporation . . . ." [*Id.*] Wright signed as a guarantor individually and on behalf of Wright Capital Partners and Wright Group International, and Hudson signed as a guarantor individually and on behalf of Hilton Publishing. [*Id.* at 4-5.]

Just a few months after the sale/leaseback closed, the Hospital wasn't doing well, and needed financial help. A second transaction took place in October 2006, whereby the Hospital was eventually sold to the Sisters of St. Francis. Yessenow and the other investors in the holding company that owned the main Hospital property at 217 Superior Avenue received large distributions from the sale. When all was said and done, Yessenow received a payment of approximately $2.2 million from the sale. [DE 173-5, at 74-76.]

The Hospital turned out to be a bust, and the financial crunch caused a domino effect resulting in this lawsuit. First, the investor (NL Ventures) drew on the letter of credit – the one securing the rent payments – in the amount of $1,467,948.00. [*See* 158-6; 158-11.] Then the bank turned to Yessenow, demanding that he repay the March 17, 2006 Promissory Note for $1.5 million. [DE 158-10.]. Facing foreclosure on his Chicago condo, Yessenow ended up settling with the bank for $1.15 million. [DE 158-11.] Yessenow now seeks to recoup his losses

6

from Hudson based on his guaranty of the Indemnification Agreement. For his part, Hudson claims that Yessenow was made entirely whole when he received $2.2 million from the sale of the Hospital to the Sisters, because that $2.2 million included funds to satisfy Yessenow's obligation to the bank from the pledging of his condo as security.

Yessenow originally filed suit in Indiana state court, and it was removed to this Court on January 5, 2009. [DE 16.] The Amended Complaint includes four counts: (1) a request for a declaratory judgment that the Indemnification Agreement is valid and requires all the Defendants to indemnify Yessenow; (2) a claim of constructive fraud; (3) a request for a preliminary injunction seeking to freeze the Defendants' assets; and (4) a breach of contract claim.

After clarifying that diversity jurisdiction was proper [DE 9, 16], I held a hearing on Yessenow's request for a preliminary injunction freezing assets. I denied the motion [DE 35, 50]. Count 3 – the one requesting injunctive relief – is therefore moot and need not be discussed further.

Yessenow now seeks summary judgment on his declaratory judgment and breach of contract claims. Hudson also seeks summary judgment on the breach of contract action claiming that the Indemnification Agreement is unenforceable because it lacks consideration. In the alternative Hudson claims that Yessenow was made whole when the hospital was sold and he received $2.2 million and that this was an accord and satisfaction. Finally, Hudson claims that Yessenow's constructive fraud claim is a nonstarter.

## Discussion

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine

7

dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). In reviewing cross-motions for summary judgment, a court must view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion is made. *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. # 506*, 545 F.3d 555, 559 (7th Cir. 2008).

Yessenow contends that Hudson – as a guarantor of the March 31, 2006 Indemnification Agreement – is required to pay for the losses Yessenow sustained in fending off the foreclosure of his condo. Hudson responds that the Indemnification Agreement lacks consideration, and in the alternative, that Yessenow's receipt of $2.2 million from the sale of the Hospital to the Sisters included funds to cover the promissory note secured by the mortgage on Yessenow's condo. This, according to Hudson, is an accord and satisfaction.

Hudson's second argument is fraught with questions of fact. It is true that Hudson submitted evidence which tends to show that the $2.2 million payment received by Yessenow when the Hospital was sold included money to cover the loss he was exposed to from the pledging of his condo. But Yessenow submitted contrary evidence that the $2.2 million represented a disbursement to him of his interest in the holding company that owned the Hospital's real estate, and it had nothing to do with the pledging of his condo. In sum, there are issues of fact related to Hudson's affirmative defenses of payment and accord and satisfaction, so summary judgment on those defenses is denied.

Unlike the affirmative defenses, the validity of the Indemnification Agreement doesn't require a trip through a thicket of unclear facts. The parties don't dispute that Indiana law

applies to the Indemnification Agreement. [DE 157, at 13; DE 172, at 9.] Hudson contends that the Indemnification Agreement, and the guaranty contained within it, lack consideration. Where a guaranty is signed contemporaneous to the benefit given, separate consideration for the guaranty is unnecessary. *United States v. Meadors*, 753 F.2d 590, 596-98 (7th Cir. 1984); *Vanek v. Indiana National Bank*, 540 N.E.2d 81, 84 (Ind. App. 1989), decision aff'd, 551 N.E.2d 1134 (Ind. 1990); *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 858-59 (Ind. Ct. App. 2007). This rule is subject to exceptions, but for our purposes, the general rule applies because the guaranty is contained within the Indemnification Agreement, and they were signed at the same time. [*See* DE 158-5.] Consequently, if the Indemnification Agreement is supported by consideration, then so too is the guaranty that Hudson signed as part of the same agreement. The inquiry therefore becomes whether the Indemnification Agreement was supported by consideration.

Indemnification agreements are construed in the same manner as other contracts. *See Kruse Classic Auction Co., Inc. v. Aetna Cas. & Sur. Co.*, 511 N.E.2d 326, 328 (Ind. App. 1987). Construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. *Noble Roman's Inc. v. Pizza Boxes, Inc.*, 835 N.E.2d 1094, 1098 (Ind. App. 2005). This is especially true when a contract is unambiguous, and the Court must simply enforce the terms of the agreement. *Skrypek v. St. Joseph Valley Bank*, 469 N.E.2d 774, 777 (Ind. App. 1984). As the Seventh Circuit has explained, "[i]nterpreting contractual language is a job for the court when no parol evidence bears on its meaning." *Biomet Orthopedics, Inc. v. Tact Medical Instruments, Inc.*, 454 F.3d 653, 655 (7th Cir. 2006) (construing Indiana law). And whether a contract is supported by consideration is also a

9

question of law for the court. *Indiana Department of State Revenue v. Belterra Resort Indiana, LLC*, 935 N.E.2d 174, 179 (Ind. 2010).

Construction of an unambiguous contract is limited to the language found within the instrument. *Hilbert v. Conseco Services,* LLC, 836 N.E.2d 1001, 1008 (Ind. App. 2005). Thus, parol evidence – evidence that varies the terms of the contract – is inadmissible where there is no ambiguity in the language. *Evan v. Poe & Associates, Inc.*, 873 N.E.2d 92, 101 (Ind. App. 2007). A contract is ambiguous if reasonably intelligent people could find its provisions susceptible to more than one interpretation. *Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1290 (Ind. App. 2000). However, the terms of a contract are not ambiguous simply because a controversy exists between the parties concerning the proper interpretation of terms. *Ostrander v. Board of Dirs. of Porter County Educ. Interlocal*, 650 N.E.2d 1192, 1196 (Ind. App.1995). The Indemnification Agreement is completely unambiguous, and indeed the parties essentially agree as much. [DE 178, at 9-10; DE 179, at 5.]

Prior to analyzing the Indemnification Agreement, there is a preliminary question that must be addressed: whether my construction of the Agreement should take into account the whole host of other agreements that formed the basis of the merger between TWG and Illiana, and the sale leaseback agreement with NL Ventures. In general, writings executed at the same time and relating to the same transaction or subject matter will be construed together. *Samar*, 726 N.E.2d at 1290. But under Indiana law, when there are different parties to the agreements, this rule must be applied with some caution. *Murat v. South Bend Lodge No. 235 of Benev*, 893 N.E.2d 753, 757 (Ind. Ct. App. 2008) ("We believe the [contemporaneous document] doctrine should be applied cautiously when the documents involve different parties."); *Keystone Square*

*Shopping Center Co. v. Marsh Supermarkets, Inc.*, 459 N.E.2d 420, 424 (Ind. Ct. App. 1984); *see Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind. Ct. App. 1993). This is entirely sensible. Generally speaking, if X and Z sign a contract and Y and Z sign a separate contract the same day, from X's point of view, it is difficult to see why Y's contract with Z should be used to interpret X's contract with Z.

Yessenow contends that the contemporaneous document doctrine requires that I consider the two copies of the promissory note, the mortgage, and the other closing documents to properly construe the Indemnification Agreement. In other words, Yessenow claims that the pledging of his condo to make the deal with NL Ventures go through was sufficiently connected to the Indemnification Agreement to require all the documents to be construed together. But the Indemnification Agreement wasn't necessary for the merger to close. We know this because the deal with NL Ventures closed a number of days *prior* to the Indemnification Agreement being signed. The Indemnification Agreement was an after-the-fact determination of who should bear the risk of the Hospital defaulting on its lease with NL Ventures. So I am not persuaded that I should look to the array of other documents that were signed in bringing about the merger between TWG and Illiana and the sale leaseback transaction with NL Ventures in attempting to construe the Indemnification Agreement.

There are a number of things that lead me to that conclusion. First, there's no mention of the Indemnification Agreement in all the documents relating to the sale/leaseback. It's not mentioned in the Promissory Note, the Disbursement Request and Authorization, the Mortgage Agreement, the Letter of Credit, the Lease Agreement with NL Ventures, or the Sale and Purchase Agreement. [*See* DE 158-6; DE 173-3; DE 173-9; DE 18-3; DE 158-3; DE 158-4.]

Although the Indemnification Agreement references the Promissory Note, Mortgage, and Letter of Credit, those documents weren't signed on the same date as the Indemnification Agreement.

What's more, the Indemnification Agreement contains a provision making clear that there are no other agreements between its parties. Here's what it says: "<u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the parties and contains all of the agreements among the parties with respect to the subject matter hereof." [DE 158-5, at 4.] This would be an odd provision to put into the Indemnification Agreement if the parties actually meant to have a whole host of other contracts bear on the interpretation of the Agreement.

More important still is the fact that there are different parties involved in the Indemnification Agreement – namely, Hudson and Hilton Publishing. Hudson was not a party to the merger agreement between TWG and Illiana. Nor was he a party to the sale/leaseback agreement between Illiana and NL Ventures. And obviously, he wasn't a party to the promissory note signed by Yessenow pledging his condo.

All of these facts militate against application of the contemporaneous document doctrine. Weighing them against the only fact favoring application of the doctrine – that the Indemnification Agreement mentions the other documents – leads me to conclude that I need to construe the Indemnification Agreement alone.

All of which finally brings me to the interpretation of the Indemnification Agreement. First, the Indemnification Agreement describes the "Obligation":

> Obligor has executed a Promissory Note payable [sic] the Bank, known as Loan Number 102449, secured by a Mortgage likewise executed and duly granted to the Bank by Obligor (collectively the "Obligation").

[DE 158-5, at 1.] All this means is that Yessenow previously undertook ("*has executed*") an obligation – the signing of a promissory note secured by a mortgage on his condo. There is nothing ambiguous about this, and neither party disagrees. The next relevant recital states that the "Corporation desires to protect Obligor from any loss, costs, expenses, damages or injury. . . by reason of the Obligation . . . ," followed by another clause that Yessenow "wishes to obtain the same upon said terms." Then, after including some boilerplate consideration language (more on that in a moment), the agreement describes the terms of indemnification. [DE 158-5, at 1-2.] Again, this language is clear. The Corporation was willing to indemnify Yessenow for any losses associated with the promissory note, and Yessenow wanted the same.

So the next question is, what is the consideration supporting this agreement? And the short answer is – none. Contracts require consideration. *Sands v. Helen HCI, LLC*, 945 N.E.2d 176, 180 (Ind. App. 2011). Consideration can be described as a "bargained for exchange" with either "a benefit accruing to the promisor or a detriment to the promisee." *DiMizio v. Romo*, 756 N.E.2d 1018, 1022-23 (Ind. App. 2001) (citations omitted); *Gibson v. Neighborhood Health Clinics, Inc*. 121 F.3d 1126, 1130 (7th Cir. 1997). A benefit is a legal right given to the promisor to which he would not otherwise be entitled. *DiMizio,* 756 N.E.2d at 1023. So if a party "[receives] nothing in return," he may be excused from performing under a contract. *Estate of Luster v. Allstate Insurance Co.*, 598 F.3d 903, 908 (7th Cir. 2010).

So what legal right or benefit did the Corporation (the promisor) get when it signed the Indemnification Agreement? Again, the answer is none. The Corporation was already in receipt of the supposed benefit – the acquisition of Illiana. And past consideration generally cannot support a new obligation or promise. *Jackson v. Lluellen Farms, Inc.*, 877 N.E.2d 848, 858 (Ind.

13

Ct. App. 2007); *Field v. Alexander & Alexander of Ind., Inc.*, 503 N.E.2d 627, 631 (Ind. Ct. App. 1987); *Davis v. B.C.L. Enters., Inc.*, 406 N.E.2d 1204, 1206 (Ind. Ct. App. 1980).

While it is true that the Indemnification Agreement included a sentence that the agreement was supported by consideration, that phrase is a throwaway. Here's all it says about consideration: "NOW, THEREFORE, for good and valuable consideration, the parties hereto, intending to be legally bound, hereby agree as follows:" That's it. It is true that under black-letter contract law it is generally "inappropriate . . . for courts to inquire into the adequacy of consideration." *See Stainbrook v. Low*, 842 N.E.2d 386, 397 (Ind. Ct. App. 2006). But I am not asking about the *adequacy* of the consideration here – I am asking about its *existence* in the first place, an entirely separate question. *See Meridian S.E.T., LLC v. Auditor of Marion County*, 2012 WL 252432, at *3, n.4 (Ind. App. Ct. 2012) ("[Plaintiff] is correct in stating that it would be improper for us to inquire as to the adequacy of consideration... However, the issue here is not the adequacy of consideration but rather its existence."); *Northwest Diversified, Inc. v. Desai*, 353 Ill. App. 3d 378, 390 (Ill. App. Ct. 2004) (observing that, despite a general disinclination to question the adequacy or sufficiency of consideration, courts employ a different approach when there is a question regarding the existence of consideration).

And addressing the *existence* of consideration, it is also black-letter contract law that a "false recital of consideration" is "a mere pretense of bargain [that] does not suffice" to create a contract. *Restatement (Second) of Contracts* § 71, cmt. b (1981). See also, *id.* at § 87, cmt. c., ("A recital in a written agreement that a stated consideration has been given is evidence of that fact as against a party to the agreement, but such a recital may ordinarily be contradicted by evidence that no such consideration was given or expected."); 3 Richard A. Lord, *Williston on*

*Contracts* § 7:23 (4th ed. 2011) ("If merely saying in writing that a specified fictitious consideration had been received were enough to make a promise binding, a new kind of formal obligation would be created.").

So in this case the mere recital of consideration doesn't automatically translate to a legal conclusion that consideration exists. And in fact, reading the remainder of the contract actually brings me to the opposite conclusion – although the agreement states that it was supported by consideration, there was none because, as I have mentioned, the Corporation had *already received* the benefit the Agreement purportedly gave it. Recall that the Corporation is what resulted from the merger between TWG and Illiana. Yet that is the very thing that Yessenow claims the Corporation received – the closing of the merger and the birth of the Corporation – as consideration for signing the Indemnification Agreement. By definition, this means that the Corporation received "nothing in return" when it signed the Indemnification Agreement. *Estate of Luster,* 598 F.3d at 908. In other words, the Corporation received no legal right or benefit by signing the Indemnification Agreement that it did not already have. *DiMizio*, 756 N.E.2d 1022-23 (Ind. App. 2001).

The same is true for any detriment to Yessenow. The proper question is whether the Corporation's promise of indemnity induced Yessenow's detriment – the signing of the promissory note. The answer is no because by the time the Indemnification Agreement was signed, Yessenow's condo was already on the hook. We know this because the recitals of the Indemnification Agreement make this clear. They state that Yessenow "*has executed* a Promissory Note," "secured by a Mortgage likewise *executed and duly granted* to the Bank" by Yessenow. [DE 158-5, at 2. (emphasis added)] The only reasonable interpretation of this

15

statement is that Yessenow *had previously signed* the promissory note secured by the mortgage on his condo. So at the time the March 31 Indemnification Agreement was signed, Yessenow had already taken on the obligation necessary for the sale/leaseback to close. Once again, this is past consideration. *Jackson*, 877 N.E.2d at 858; *Davis*, 406 N.E.2d at 1206.

Yessenow's position is that the recitals preceding the consideration language detail the benefit the Corporation would receive from the Indemnification Agreement. Specifically, Yessenow would not provide a personal line of credit to secure the Letter of Credit from the bank without the Indemnification Agreement. Therefore, according to Yessenow, when it signed the Indemnification Agreement, the Corporation benefitted because the sale/leaseback could proceed. But this is plainly belied by the language of the Indemnification Agreement which makes it clear that the merger between TWG and Illiana as well as the sale/leaseback with NL Ventures *had already taken place.*

Yessenow points to extrinsic evidence that when he signed the Indemnification Agreement, he hadn't yet signed the promissory note. [*See* DE 178 at 13-15.] In particular, he points to the second copy of the promissory note that he signed on April 5, 2006. Setting aside for the moment that this is parol evidence, it isn't particularly persuasive evidence anyway. The loan was approved on March 16, 2006. [DE 173-7]. And the first copy of the promissory note, the mortgage, and the bank's disbursement are all dated the following day, March 17, 2006 – all well prior to the signing of the Indemnification Agreement. [DE 18-3, 18-4, 173-9 and 158-5].

In any event, I have to set aside this supposed factual dispute because all of this evidence is inadmissible under the four corners rule. *Skrypek*, 469 N.E.2d at 777; *Tri-Central High School v. Mason*, 738 N.E.2d 341, 344 (Ind. App. 2000) ("If [a] contract is unambiguous, a court

will not look beyond the four corners of the document to determine the parties' intent.") This is because Yessenow's position contradicts the unambiguous terms of the Indemnification Agreement which make it abundantly clear that he had already signed the promissory note when he signed the Indemnification Agreement. If Yessenow's position were correct, the language in the contract would have been different. For instance, the recitals would have been forward-looking, using language such as Yessenow "will execute a Promissory Note" and "will execute a mortgage to secure it." But it is clear that the language is in the past tense, and the only reasonable interpretation of the recitals (and the parol evidence as well for that matter) is that Yessenow had already signed the promissory note and mortgage agreement, and only after the fact was he seeking through the Indemnification Agreement to shift the risk that he had assumed to the Corporation (and then to Hudson and Wright via the personal guaranty).

There is no socially useful reason for a legal system to enforce agreements that are not supported by consideration. And in this case there was no bargained-for exchange. What appears to have happened is that Yessenow was simply looking for a way to off-load the risk he had taken. So he approached Wright and persuaded him to sign the Indemnification Agreement on behalf of the newly formed Corporation and thereby shift the risk from Yessenow to the Corporation. But when the Indemnification Agreement was signed, the Corporation had already received the benefit of the merger, and Yessenow had already incurred his detriment. Quite simply, the Indemnification Agreement is devoid of any consideration, and so too is the guaranty. Accordingly, the Indemnification Agreement is unenforceable. This conclusion results in summary judgment in favor of Hudson on the declaratory judgment claim in Count 1 and the breach of contract claim in Count 4.

There is one more matter to address relating to the constructive fraud claim in Count 2. It fails as well. There are five elements to a constructive fraud claim: "1) a duty existing by virtue of the relationship between the parties; 2) representations or omissions made in violation of that duty; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate result thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party." *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250-51 (Ind. Ct. App. 1998).

Yessenow's constructive fraud claim lacks the first and second elements. As to the first element, Yessenow, Wright, and Hudson didn't owe each other a duty. Yessenow's position is that because he, Hudson, and Wright were joint venturers in the sale/leaseback transaction, they owed each other fiduciary duties. According to Yessenow, Hudson and Wright represented to Yessenow that the Letter of Credit from the bank would be revocable and for only a six-month term. [DE 63 ¶ 53.] Consequently, because the Letter of Credit was irrevocable and extended, Hudson and Wright breached their duty to Yessenow and can be held liable for constructive fraud. I disagree.

Under Indiana law, a joint venture is "an association of two or more parties formed to carry out a single business enterprise for profit," and it involves "only a single transaction." *Lauth Ind. Resort & Casino, LLC v. Lost River Dev., LLC*, 889 N.E.2d 915, 920, 922 (Ind. Ct. App. 2008) (emphasis omitted). For a joint venture to exist, "the parties must be bound by an express or implied contract providing for (1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking." *Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir. 1989) (citations and quotation marks omitted).

Here, Hudson, Wright, and Yessenow were associated with one another, but their involvement – based on the facts before me – doesn't establish a joint venture. For one, there's no express agreement between the three of them other than the invalid Indemnification Agreement. Even if I had concluded that the Indemnification Agreement was supported by consideration, this agreement was signed by the three of them *after* the sale/leaseback deal closed. Because Hudson wasn't a player in any of the agreements involved in the sale/leaseback, Yessenow and Hudson didn't have equal or joint control in the deal. And I can quickly dismiss the notion that there was an implied agreement because Yessenow admitted at the preliminary injunction hearing that "Dr. Hudson . . . was not really involved until probably after the [sale/leaseback] other than through his financial investments." [Hearing Tr., DE 88, at 89:3-9.] Yessenow doesn't provide any facts to rebut that statement. The undisputed facts therefore don't show that a joint venture existed because Hudson's involvement didn't amount to "an equal right to direct and govern the undertaking." *Wilson*, 874 F.2d at 392. Given the absence of a joint venture, there are no facts before me indicating that Hudson owed Yessenow the duty of care necessary for a constructive fraud claim.

What's more, there's no evidence of a representation or omission that would violate that duty. Taking the allegations in the Amended Complaint as true, Hudson told Yessenow that the Letter of Credit would be revocable and that his line of credit wouldn't be extended. In response to Hudson's motion for summary judgment, Yessenow doesn't cite to any *evidence* that Hudson actually made this statement. Setting that issue aside, the alleged statement merely indicates Hudson's intent to engage in a particular sort of deal, which doesn't establish a fraud claim. *Sees v. Bank One, Indiana, N.A.*, 839 N.E.2d 154, 163 (Ind. App. 2005); *Kopis v. Savage*, 498

19

N.E.2d 1266, 1272 (Ind. App. 1986). Yessenow fails to save this claim by pointing to any other evidence of fraud. Accordingly, Count 2's constructive fraud claim fails.

For the foregoing reasons, the declaratory judgment, breach of contract, and constructive fraud claims fail as a matter of law. Hudson and Hilton Publishing's Motion for Summary Judgment is **GRANTED**, and Yessenow's Motion for Summary Judgment is **DENIED**.

There is one final matter to address. In the Amended Complaint, each claim against Hudson also names Defendants Leroy Wright, Wright Capital Partners, LLC, and Wright Group International Holdings, LLC . [*See* DE 63, at 1.] Yessenow hasn't actively pursued the claims against Wright or his companies, probably because Wright is now deceased and his companies judgment proof. But Yessenow has not filed dismissal papers either. So Wright and his companies remain on the docket as defendants in this case. Yessenow is **ORDERED** to advise the Court within 14 days whether he intends to pursue the claims against Wright's estate or his entities. Pursuant to Federal Rule of Civil Procedure 54(b), entry of a final judgment will be withheld pending a resolution of the remaining parties and claims.

**SO ORDERED**.

ENTERED: July 19, 2012

    /s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT